IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BADLANDS TRUST COMPANY, ET AL. *
                                                             *
        v.                                        *   Civil No. JFM-02-2423
                                                           *
FIRST FINANCIAL FUND, INC.     *
                                                   *****

OPINION

First Financial Fund, Inc. ("Fund") has a bylaw providing that "[d]irectors shall be elected by vote of the holders of a majority of the shares outstanding and entitled to vote thereon." This case presents the question whether the bylaw is valid under the Maryland General Corporation Law (MGCL) and the Investment Company Act of 1940. For the reasons that follow, I find it is invalid under the MGCL. Therefore, I do not reach the question of its validity under the Investment Company Act.

I.

The Fund is a Maryland corporation registered with the U.S. Securities and Exchange Commission as a closed-end investment company. Plaintiff, Badlands Trust Company ("Badlands"), is the trustee of one of several trusts that are controlled or advised by Stewart R. Horejsi. Badlands and other stockholder interests controlled or advised by Horejsi have acquired 30.6% of the outstanding shares of the Fund.

The Fund held its annual meeting on August 12, 2002. The meeting was preceded by a vigorous proxy contest between management and Horejsi. One of the items on the agenda at the meeting was the election of two directors. Management supported Eugene C. Dorsey and Robert E. LaBlanc. Horejsi supported Dean Jacobson and Joel W. Looney. LaBlanc and Dorsey received, respectively, 7,817,386 and 7,812,470 votes. Jacobson and Looney each received

11,174,771 votes.

Jacobson and Looney received 58.84% of the votes cast.[1] However, not all of the Fund's 23,622,382 outstanding shares were voted, and the votes received by Jacobson and Looney constituted only 47.3% of those shares. Therefore, if the Fund's bylaw requiring a director to be elected by "a majority of the shares outstanding and entitled to vote thereon" is valid, Jacobson and Looney did not win seats on the Board. On the other hand, if the bylaw is invalid and

---

[1] These percentage figures are derived by dividing the number of votes received by each candidate by 18,993,157. The 18,993,157 denominator, in turn, is derived by dividing the aggregate votes cast - 37,979,398 - by two. The reason for the latter calculation is that votes were cast for two separate director positions.

In a supplemental memorandum the Fund has put forward a belated argument that in an election where there is more than one vacancy the total number of "votes cast" for each position must be added together to determine if any one person has received the majority required by section 2-506(a)(2) of the MGCL. Thus, according to what the Fund now contends, Dr. Jacobson and Mr. Looney did not receive 58.84% of the votes cast (11,174,771/18,993,157) but only 29.42% of the votes cast (11, 174,771/37,979,398). If the Fund's position were correct, when the General Assembly enacted section 2-506(a)(2), it intended to create an almost insurmountable supermajority requirement. Such a requirement would have been markedly inconsistent with the democratization principle that the change in section 2-506(a)(2) embodied.

Further, if the Fund's interpretation of section 2-506(a)(2) were correct, the General Assembly created a scheme of corporate management that was entirely unworkable. It would have resulted in the near inevitability of deadlocks in contested director elections. Yet the Fund has presented no affidavits from practicing lawyers that such deadlocks routinely occurred between 1951 and 1981, when the default plurality rule of 2-404(d) was enacted, or that such deadlocks continue to occur today within corporations that have opted out of the default rule. Moreover, in Roland Park Shopping Center v. Hendler, 206 Md. 10, 109 A.2d 753 (1954), a case involving, inter alia, a battle for control over a corporation's board between the only two owners of the corporation's stock, the majority owner had voted "his six of the outstanding ten shares" to elect a board of three directors. 206 Md. at 15, 109 A.2d at 755. If the Fund's interpretation of "the majority of all votes cast" language of section 2-506(a)(2) were correct, this vote would have been insufficient to elect any one of the directors because even if the minority shareholder had not voted his shares at all (a fact unknowable from the court's opinion), none of the nominees proposed by the majority shareholder would have received a majority of the eighteen votes (six for each of the three directors) cast by the majority stockholder himself. None of the parties, their counsel, the trial court, or the Maryland Court of Appeals suggested that this was the case.

Jacobson and Looney were required only to receive a majority of the votes cast at the stockholders' meeting, they were elected as directors.

II.

A.

Section 2-506(a)(2) of the MGCL provides that "[u]nless this article or the charter of a corporation provides otherwise, at a meeting of stockholders . . . [a] majority of all the votes cast at a meeting at which a quorum is present is sufficient to approve any matter which properly comes before the meeting." It is not disputed that a quorum was present at the Fund's August 12, 2002 stockholders' meeting, that the election of directors was properly before the meeting, and that the Fund's charter does not require a vote greater than "a majority of all the votes cast" for the election of directors. Therefore, unless the MGCL itself "provides otherwise," the Fund's bylaw requiring for the election of directors "a majority vote of the shares outstanding and entitled to vote thereon" is invalid.

The Fund relies upon section 2-404(d) as the source of authority for its bylaw. That section provides that "[u]nless the charter or bylaws of a corporation provide otherwise, a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director." According to the Fund, section 2-404(d) permits a corporation to adopt a bylaw establishing a voting requirement for the election of directors that exceeds not only a plurality but also the presumptive rule of majority of all votes cast established by section 2-506(a)(2).

The Fund's argument is not without superficial appeal, particularly since section 2-506 is of general application while section 2-404 applies particularly to the election of directors. However, the Maryland Court of Appeals has stated that "the paramount goal of statutory

3

interpretation is to identify and effectuate the legislative intent underlying the statute(s) at issue." Derry v. State, 358 Md. 325, 335, 748 A.2d 478, 483 (2000); see also Tucker v. Fireman's Fund Ins. Co., 308 Md. 69, 73, 517 A.2d 730, 731 (1986). Here, the legislative background makes clear that when it enacted section 2-404(d), the Maryland General Assembly did not intend to undermine the mandate of section 2-506(a)(2) that a corporation can establish a supermajority vote requirement for the election of directors only by charter provision.

Prior to 1951, when section 2-506(a)(2) was enacted, bylaws could "require for any purpose a proportionate vote greater than that required by statute for such purpose." See H. Brune, Maryland Corporation Law § 68 (1933 ed.). Section 2-506(a)(2) changed that rule to permit a vote requirement higher than a vote by a majority of votes cast for a matter properly brought before a stockholders' meeting at which a quorum was present only if that requirement is contained in the corporation's charter or in the MGCL itself. Reporter's Notes to the 1951 Revisions of the MGCL (quoted in Larkin v. Baltimore Bank Corp., 769 F. Supp. 919, 922 n.2 (D. Md. 1991). The change was an important one for the effectuation of the principle of corporate democracy. It prevented directors from establishing, by bylaw, supermajority voting requirements that would transfer from the stockholders to themselves the power to make critical corporate decisions.

The general rule established by section 2-506(a)(2) has remained intact for over half a century. However, in the years following its enactment a problem arose which the General Assembly addressed in 1981 by enacting section 2-404(d). As explained in a statement accompanying the bill from which the section was derived, experience under section 2-506(a)(2) had taught that "[i]t is . . . possible that no nominees would receive a majority of the votes cast,

4

in which case there would be no election and the current directors could continue to serve until the next annual meeting of stockholders. The Bill would essentially eliminate the possibility of these bizarre circumstances." Explanation of Senate Bill No. 659 Vote Required to Elect Directors (quoted in Ideal Fed. Sav. Bank v. Murphy, 339 Md. 446, 458, 663 A.2d 1272, 1277-78 (1995)). The express purpose of the bill was to cure this problem by "provid[ing] that corporate directors may be elected by a plurality of the votes cast if a quorum is present." Id. at 457, 663 A.2d at 1277.[2]

In other words, section 2-404(d) was intended to make it easier to elect directors and to reduce the number of failed elections. The Fund's interpretation of the section would defeat the accomplishment of that intent by authorizing directors to adopt bylaws that would - through the establishment of a supermajority requirement - make it harder to elect directors and increase the number of failed elections. The Fund would also attribute to the Maryland General Assembly the paradoxical intent of choosing to reverse offhandedly - through the enactment of a statutory provision designed to make directorship elections more democratic - a major policy decision it had made in favor of shareholder democracy thirty years before. The very reason the Fund interprets section 2-404(d) as it does is to entrench the former directors in their positions by enabling them to continue to serve as directors holding over for a year, see MGCL § 2-405, and to make their opponents' challenge at the next election unappealing to unaligned stockholders

---

[2] I must confess that it is not entirely clear to me that a bylaw establishing a plurality vote requirement would have been invalid even without the enactment of section 2-404(d). Section 2-506(a)(2) provides only that a majority of all votes cast is sufficient for approval of a matter; it does not say that a majority of all votes cast is necessary. However, what matters for present purposes is that the General Assembly perceived that it was necessary to amend the MGCL to validate a plurality voting requirement and that this was the only reason expressed for the enactment of section 2-404(d).

who would be faced with the prospect of the Fund's dissolution in the event of another failed election. See MGCL § 3-413.

B.

Since the intent of the General Assembly in enacting section 2-404(d) is clear, the only remaining question is whether the language of section 2-404(d) or of section 2-506(a)(2) is so plain and unambiguous as to preclude inquiry into the legislature's intended meaning. Williams v. Mayor & City Council of Baltimore, 359 Md. 101, 115, 753 A.2d 41, 49 (2000); Marriott Employees Fed. Credit Union v. Motor Vehicle Admin., 346 Md. 437, 444, 697 A.2d 455, 458 (1997). The language of neither statute has that effect.

Section 2-404(d) is unambiguous only in establishing a default plurality vote rule for the election of directors in the absence of a contrary charter or bylaw provision. Beyond that, the section is opaque. It might mean (as the Fund argues) that a corporation may set any voting requirement it wants for the election of directors by charter or by bylaw.[3] On the other hand, it might mean (as Badlands contends) that whatever action the corporation takes under section 2-404(d) is subject to the rest of the MGCL, specifically the presumptive majority of votes cast rule established by section 2-506(a)(2). Since section 2-404(d) is thus susceptible to two different readings, its language is not so plain as to defeat "the paramount goal of statutory interpretation" of gleaning the legislative intent. Derry, 358 Md. at 335, 748 A.2d at 483.

---

[3] The Fund also argues that Badlands' interpretation of section 2-404(d) has the effect of reading the term "bylaw" out of the section entirely. Of course, it does not. Were "bylaw" not included in section 2-404(d), a corporation would be able to opt out of the default plurality vote rule only by charter provision, even if it instead adopted the majority of votes cast rule of section 2-506(a)(2).

Just as section 2-404(d) clearly establishes a default plurality vote rule for the election of directors, so too does section 2-506(a)(2) clearly establish a presumptive majority of votes cast rule for all matters properly before a stockholders' meeting where a quorum is present. However, like section 2-404(d), section 2-506(a)(2)'s clarity stops there. The issue presented in this case concerns the meaning of the verb "provide[s]" in the initial clause of the section which makes the presumptive rule applicable "[u]nless this article . . . provide[s] otherwise."[4] Again, the word is susceptible to two different readings. It might mean (as the Fund argues) "permits," "allows," "authorizes," or "specifies the means through which the corporation may specify its own requirement." On the other hand, it might mean (as Badlands posits) "prescribes a specific voting requirement." If the first interpretation is adopted, section 2-404(d) would constitute a provision of the MGCL falling within the "unless clause" of section 2-506(a)(2); if the second interpretation is adopted, section 2-404(d) is outside the unless clause since it does not itself set any specific voting requirement.

The mere existence of this ambiguity is dispositive since it triggers the inquiry into the General Assembly's intent that I have resolved in Badlands' favor.[5] I further note, however, that

---

[4]More precisely, the issue is the meaning the General Assembly attributed to "provide[s] otherwise" as used in section 2-506(a)(2) when the Assembly enacted section 2-404(d) in 1981. Theoretical though this distinction may seem, it helps clarify analysis by underscoring that I am not being called upon to interpret the words "provide[s] otherwise" in the abstract but in a context where one proffered meaning of the term makes what the General Assembly did in 1981 sensible and the other proffered meaning of the term does not.

[5]The Fund points out that in Larkin v. Baltimore Bancorp, supra, when considering the validity of a bylaw establishing an 80% stockholders' voting requirement for the amendment of bylaws, I indicated that section 2-109(b), which does not set another specific voting requirement but arguably empowers a board by implication to adopt by bylaw a supermajority vote of stockholders for amendment of the bylaws, falls within the "provide[s] otherwise" language of section 2-506(a)(2). However, as the Fund acknowledges, my discussion of the point was only

7

Badlands' interpretation is wholly consonant with the statutory scheme since there are numerous other sections of the MGCL that do prescribe a shareholder vote greater than the majority of votes cast at a meeting requirement established by section 2-506(a)(2). See, e.g., MGCL §§ 2-306(b)(4), 2-309(b)(5)(ii), 2-604(e), 3-105(e), 3-403(d), 3-501(d), 3-602(b), and 3-702(a). These sections provide the background against which section 2-506(a)(2) was enacted. They also squarely fall within the "provide[s] otherwise" clause and make it unnecessary to read that clause expansively (as the Fund would have me do) in order to give it meaning.

For these reasons, I find that the Fund's bylaw requiring a majority of shares outstanding to elect a director is invalid under Maryland law. Therefore, I will enter an order denying the Fund's motion for summary judgment, entering summary judgment on behalf of Badlands, and enjoining the Fund to seat Badlands' nominees as directors.

Date: September 19 2002

J. Frederick Motz
United States District Judge

---

dictum. Moreover, it does not appear I was presented with or considered the alternative reading of the "provide[s] otherwise" language that is critical here.

Larkin was also complicated by the fact that arguably section 2-109(b) empowers directors to vest the power to amend bylaws exclusively in the board. If that is so, section 2-506(a)(2) would not apply to such a bylaw at all since that section is applicable only to a "matter which properly comes before the [stockholders'] meeting." By definition, the amendment of a valid bylaw vesting exclusive power to amend the bylaws in the board could not be considered at a stockholders' meeting. Therefore, I was confronted in Larkin with the potential paradox that the board could divest stockholders' of the power to amend bylaws entirely but could not vest them with the power to amend bylaws by a supermajority vote. I say all of this not to suggest that my dictum in Larkin was correct but only to emphasize that I was presented with a set of issues far different from the one presented here.